At a Court of Oyer and Terminer held at this term, John Danby was indicted and tried for murder of the first degree in killing John Burnett, alias John Burnett, in the city of Wilmington on the eighth day of October preceding. The deceased was standing at the time on the pavement on the western side of French Street, and not far from the curb of it, with his face turned towards the other side of the street, with a small daughter of his standing by his side and whom he held by the hand, when the prisoner who was walking up *Page 167 
the pavement stepped up behind him to within four feet of him and shot him in the back of the neck with a pistol. The deceased instantly fell forward to the pavement his full length and face downward, when the prisoner immediately fired three more shots from his pistol at his prostrate body, and then turning had advanced but a few more steps up the pavement when he met one of the policemen of the city whom he well knew, and who had witnessed the occurrence and was hastening to the scene of it, and stepping directly up to him said, "Sam, I give myself up to you," and surrendered himself at once into his custody. The deceased never moved after he fell to the pavement and must have died instantaneously from the first shot fired at him, for the evidence showed that of the two pistol-bullet wounds found in his body, the only mortal one was produced by a small bullet which had penetrated the back of the neck near the middle line of it to the depth of three or four inches, fracturing three joints of the vertebra; and severing the spinal column. The other was in the upper part of the right shoulder blade.
The testimony on the part of the prisoner was that he had been badly hurt in the head when a boy by a fall from an apple tree on a large stone, had a severe spell of sickness in consequence of it, and in about a year afterwards commenced having spells of sadness and depression of spirit, and in those moods would forsake and avoid the sports and amusements of his youthful companions, and would refuse to join in them, even when invited and urged by them to do it, and that similar spells of despondency and depression of spirits had been marked characteristics of his ever since, and that at such times he was subject not only to melancholy, but irrational impressions, and even unfounded and unhappy delusions in regard to the fidelity of his wife, and for the last two or three years had neglected his business very much, but that in his better and usual moods he was a quiet, peaceable, kind and timid man; and on confronting the policeman immediately after committing the act, he was as pale and white as a sheet and was *Page 168 
so much excited and agitated that he trembled all over, and when asked by him who it was he had shot, made him no answer until he was asked the same question the third time, and then replied that it was Barnett, and when asked what Burnett, replied the street commissioner, and then when asked by him why in the name of God he had shot him, made him no answer, but on his repeating the enquiry, said to him that he had destroyed his happiness forever, and that he the policeman, knew all about it; but which was, as the latter testified, the first intimation he had ever had of such a thing from any quarter whatever.
The State called and examined in reply a number of witnesses, both male and female, who had been long and well acquainted with the prisoner, and several of whom had seen and conversed with him that day prior to the occurrence, but none of whom according to their testimony, had ever discovered or suspected the existence of any unsoundness of mind on his part; while one of the State's witnesses examined in chief testified that in a conversation which he had with the prisoner in the month of September preceding, and in which he took occasion on the deceased's passing them on the street at the time, to express a favorable opinion of him as a street commissioner, the prisoner replied that he did not like him, and that he was a mean man, or to that effect.
After recapitulating the facts proved and not disputed in the case, and remarking that if there were no other matters to be noticed in the case, they would constitute murder with express malice aforethought and of the first degree under the statute, but as this was denied upon the ground of insanity on the part of the prisoner, he would now proceed to speak of that defense. In former times, — indeed, even as late as the early part of the last century, it was considered by the Courts that insanity, in order to protect a person from responsibility for crime, must be total in its character, either manifesting itself in wild, ungovernable, irrational and incongruous actions, or in stupid and passive imbecility. In other words, it was held that to be insane, so as to protect the party, he must have no more reason than a brute, an infant, or a wild beast. It does not seem to have entered into the conceptions of men at that early day that a person might generally behave in a perfectly sensible manner, and yet be insane upon some *Page 172 
one or more subjects. They do not seem to have been able to comprehend that he might be capable of reasoning well or learnedly on most subjects, whilst in respect to some one subject he might be utterly deranged. Such was the old rule of law: — a rule, severe and cruel in the extreme. And I am happy to say to you that in consequence of the improvements which have since been made in medical science and jurisprudence, more enlightened views as to the effect of disease upon the human mind have at length prevailed among men; and that under the influence of a clearer, a wiser, and more benevolent appreciation of Christian obligation, the sharp severity and inhumanity of this ancient doctrine has gradually given way, and that now, — at this day, the plea of insanity stands upon the solid ground of humanity, reason and justice.
A man may be totally and permanently insane, and in such case all his acts are excused — he is incapable of committing crime. This is called general insanity. Or, he may be totally, but temporarily insane — that is, altogether insane on all subjects for a time, and insane to such a high degree that for the time being the reason, the conscience, the will and judgment are utterly overborne, overwhelmed, and obliterated, so that an act done during the continuance of the malady cannot be said to be a voluntary act, or the act of a free agent, but the mere act of the body without the consent or concurrence of a controling mind, — being the result rather of an irresistible and uncontrollable impulse. For acts done during the existence of such a state of insanity the accused is not criminally responsible. Or a man may be but partially insane, and where this is the case, it is called mono mania, or insane delusion, and this insane delusion consists in a belief of the existence of certain imaginary things as facts, but which are not facts, and therefore have no existence; and which no reasonable or rational person could or would believe. Now, whether such partial insanity can be held sufficient to exempt a person from responsibility for criminal *Page 173 
acts will depend upon the peculiar circumstances of each particular case. The nature, the force and effect of the delusion, the degree of its intensity and controlling power, and whether the act done was committed under the direct and irresistible influence of such insane delusion, are matters of vital importance in determining the question of responsibility. It is not every wild and frantic humor of a man, or strange and unaccountable language or conduct that will show him to be laboring under insanity. The law requires something more than this. Nor is partial insanity, or insane delusion always or necessarily an excuse for crime. On the contrary, it can only be so considered where it utterly deprives the party of his reason in regard to the act charged as criminal.
The question is not whether he was insane upon any subject whatever, but whether he was insane in respect to the particular act alleged as constituting his offense. If it were otherwise, there would be an absolute immunity from punishment for crime committed under any species of insane delusion whatever, although such insane delusion might not in any degree becloud or obliterate the mental capacity of the accused to distinguish between right and wrong in regard to the particular criminal act with which he stands charged. If he is capable at the time of distinguishing between the right and wrong of that act — if he knows and understands that that act is wrong, lie is responsible. But if he has not at the time a sufficient degree of reason to distinguish between the right and wrong of that act — if he does not know and understand that that act is wrong, he is not responsible. And therefore, although he may be laboring under partial insanity, if he still understands the nature and character of his act and its consequences, if lie has a knowledge that it is wrong, and mental power sufficient to apply that knowledge to his own case, and to know that, if he does the act, he will do wrong, such partial insanity is not sufficient to exempt him from responsibility for *Page 174 
crime. This doctrine has been fully and clearly established by numerous well-considered decisions, both in England and in this country. The enquiry, therefore, in such cases, as you must have already perceived, must always be brought down to the simple, but sharp question of the sanity or insanity of the accused, at the time and in respect to the criminal act done by him. In this case the criminal act charged against the prisoner at the bar is the felonious killing of John Barnett, with express malice aforethought. To this charge the prisoner sets up the defense that at the time he did the act he was an insane man, and on this ground he claims an acquittal at your hands.
And now, gentlemen of the jury, having made these few remarks touching the subject of insanity generally, and in explanation of the principles of law involved in the proper consideration of the question at issue, I now proceed to state to you briefly those rules and tests by the light of which it is your duty as good citizens and sworn jurors to be guided in investigating and considering the evidence before you, and in making up the verdict which you shall feel yourselves constrained to return as the conscientious result of your deliberations. These rules are but few in number, and are as plain and simple as the nature of the subject will admit of. They, in fact, substantially, embody all the learning and all the law on this subject. Whatever difficulty or embarrassment you may encounter in your investigations will, I am sure, mainly arise in applying the facts before you to the law of the case. I do not know that you will have any difficulty of the kind, but; if you should, I feel very confident that a careful examination and consideration of the testimony, coupled with an honest and earnest purpose of mind and heart to arrive at the truth, will lead you to a just and satisfactory conclusion of your labors. The first rule, gentlemen, is this: Every man is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to the satisfaction *Page 175 
of the jury. This rule is primary and fundamental. It meets and challenges your attention at the very threshold of your enquiries. The prisoner at the bar, therefore, is to be considered by you to be a sane man and capable of committing crimes, until the contrary be clearly and satisfactorily established by the evidence. You will therefore, gentlemen, take this rule with you as the very ground upon which you must stand in prosecuting your enquiries upon this question. Secondly, — Insanity being matter of defense, the onus
or burden of showing or proving it lies on the prisoner. It is true such proof may sometimes arise out of the evidence offered by the State, but if it does not so arise, it must be made out from distinct evidence offered on the part of the prisoner; in either case it must be clearly sufficient to prove the fact of insanity, otherwise the presumption of sanity, or soundness of mind will stand unrebutted and in full force. But to establish a defense on this ground, it must be clearly proved that at the time of committing the act of killing, the prisoner was laboring under such a defect of reason from disease of mind as not to know the nature and quality of the act he was then doing, or, if he did know it, that he did not know he was doing what was wrong. If, therefore, this condition of insanity has been clearly and satisfactorily established by the evidence you ought to acquit the prisoner. If, on the contrary, he has failed to establish clearly and satisfactorily such a condition of insanity as I have described, it will be your duty, however painful, to return a verdict of guilty in manner and form as he stands indicted. I say guilty in manner and form as he stands indicted, because if guilty at all, he is guilty of murder in the first degree.
You thus perceive, gentlemen, that the prisoner's capacity or want of capacity at the time to comprehend the difference between right and wrong in respect to the very act with which he stands charged, is the test by which must be determined the question of his criminal responsibility. *Page 176 
I have now finished what I had to say on the law of this case. It is the duty of the Court to explain the law to the jury. I have endeavored to discharge this duty according to my best judgment and most conscientious convictions. But your duty, gentlemen, which commenced with mine, is not yet ended; the most important part of that duty yet remains to be done; and I pray God that he will not only impress your hearts with a due sense of the solemn responsibilities which now rest upon you, but that he will also be pleased to enlighten your minds by imparting to you some portion of his own great wisdom, so that you may be enabled to arrive at the very truth and right of this cause, and a true verdict give according to the evidence.
 Verdict — Not guilty by reason of insanity.